**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CYNTHIA HART,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 13 C 7829** |
| **v.** ) | |
| ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

### MEMORANDUM OPINION AND ORDER

MICHAEL T. MASON, United States Magistrate Judge:


Claimant Cynthia Hart ("Claimant" or "Hart") brings this motion for summary

judgment [19] seeking judicial review of the final decision of the Commissioner of Social

Security (the "Commissioner"), denying Hart's claim for Supplemental Security Income

("SSI") under the Social Security Act (the "Act"), 42 U.S.C. § 1382c. The Commissioner

has filed a response [26] asking the Court to affirm the previous decision. This Court

has jurisdiction to hear this matter pursuant to 42 U.S.C. § 1383(c)(3). For the reasons

set forth below, claimant's motion for summary judgment is granted in part and the

Commissioner's request for summary judgment is denied.

## I.    BACKGROUND

### A.    Procedural History

On July 15, 2010, Hart filed her application for SSI, alleging an onset of disability

of January 1, 1999 due to arthritis, an enlarged heart, heel spurs, high blood pressure,

and a slipped disc. (R. 129-35.) Her application was denied initially on November 9,

2010, and again upon reconsideration on April 14, 2011. (R. 66-77.) Hart filed a timely

request for a hearing.  (R. 80-81.)  On May 30, 2012, Hart appeared with counsel for a

hearing before Administrative Law Judge ("ALJ") Michael Hellman.  (R. 36-63.)  On June

25, 2012, the ALJ issued a written decision denying Hart's claim for benefits.  (R. 16-35.)

Hart filed a timely request for review with the Appeals Council, (R. 14), which was

denied on September 6, 2013, making the ALJ's decision the final decision of the

Commissioner.  (R. 1-6.)  This action followed and the parties consented to the

jurisdiction of this Court [6].[1]

### B.    Medical Evidence

#### 1.    Treating Physicians

On November 17, 2006, Hart underwent imaging for posterior chest pain and

shortness of breath as ordered by her physicians at Hakim Health Care.  (R. 212-13.)

No cardiac, mediastinal, or pulmonary abnormalities were noted.  (R. 213.)  On

November 18, 2006, Hart underwent a pelvic ultrasound for irregular uterine bleeding.

(R. 211.)  Multiple uterine fibroids with a large central uterine mass were found.  (*Id.*)

On August 28, 2008, Hart was seen at Hakim Health Care for atypical chest pain

and occasional dizziness.  (R. 232.)  An echocardiogram revealed left atrial dilatation,

mild to moderate concentric left ventricular hypertrophy, and mild mitral regurgitation.

(R. 217-18.)  A carotid doppler study showed less than fifty percent stenosis, meaning

findings were considered within normal limits.  (R. 229.)  On November 6, 2008, Hart

complained of pelvic pain.  (R. 279.)  She was not taking her medication because she

could not afford it.  (*Id.*)  On November 9, 2008, Hart underwent further testing for her

---

[1] Hart filed a subsequent application for SSI, which was approved at the administrative level with an onset of December 12, 2013.  (Compl. at ¶ 8.)  In this action, Hart is not seeking judicial review for any subsequent period for which she was already found disabled.  (*Id.* at ¶ 9.)

chest pain, which showed that myocardial perfusion imaging was normal, but that left ventricular systolic function was at the lower limit of normal. (R. 216.) The calculated left ventricular ejection fraction was fifty percent. (*Id.*) Pulmonary function testing in the record indicated "severe obstruction as well as low vital capacity, possibly from a concomitant restrictive defect." (R. 265.)

On January 6, 2009, Hart presented to South Suburban Hospital complaining of heavy menstrual bleeding and wheezing. (R. 242, 326.) She reported a history of hypertension, well controlled with medication. (*Id.*) She also described a previous admission in 2006 due to heavy menstrual bleeding, which resulted in a blood transfusion. (*Id.*) A pelvic ultrasound showed what appeared to be a fibroid tumor. (R. 242.) Dr. Vasan Sastry performed a D&C. (R. 243.) A chest x-ray showed that minimal infiltrate in the left midlung may be present. (R. 326.) There was no sign of cardiomegaly. (*Id.*)

Hart returned to South Suburban on October 18, 2009, again complaining of heavy vaginal bleeding and the passing of blood clots. (R. 247.) She reported a history of uterine fibroids, an enlarged heart, and hypertension. (*Id.*) An ECG during that visit showed left ventricular hypertrophy with repolarization abnormality. (R. 250.)

Hart was treated in the emergency department at Oak Forest Hospital on June 18, 2010 for numerous complaints, including hand and back pain and a cough. (R. 363.) X-rays of the lumbar spine showed signs of early osteoarthritis. (R. 361.) X-rays of both hands were normal, showing no fractures, significant arthritis, or spurs. (R. 357-60.) A chest exam showed no acute changes. (R. 355.)

On November 26, 2010, Hart returned to South Suburban complaining of left

flank pain, neck pain, and shoulder pain.  (R. 328.)  An examining physician in the

emergency department assessed cervical radiculopathy and shoulder arthritis, and

prescribed Naproxen.  (R. 329.)  A CT of the abdomen and pelvis showed no evidence

of left ureteric calculi or hydronephrosis.  (R. 311.)  Two tiny right renal calculi were

observed.  (*Id.*)  A left shoulder x-ray showed no bony or joint abnormality.  (R. 312.)  No

fracture or dislocation was seen.  (R. 321.)  She was discharged the same day and

advised to follow up with Aunt Martha's Clinic.  (R. 309.)

Hart presented to Aunt Martha's on November 30, 2010, complaining of

headaches and neck pain that radiated to her shoulder.  (R. 422.)  She said her neck

pain started in May due to a slipped disc.  (*Id.*)  She also reported that she suffered from

arthritis, an enlarged heart, and hypertension.  (*Id.*)  She rated the pain in her neck a ten

on a ten-point scale, and described it as constant and achy.  (R. 423.)  The examining

physician assessed radiculopathy, degenerative joint disease, and arthritis.  (*Id.*)  He

prescribed Vicodin and Flexeril, among other things.  (*Id.*)

Hart was seen at Oak Forest Hospital on December 5, 2010 for neck and hip

pain.  (R. 368.)  X-rays of the right hip showed early degenerative changes, but no gross

fractures or subluxations.  (R. 353.)  Hart was provided education materials for

osteoarthritis and general neck and back pain, and was advised to follow-up with her

primary physician.  (R. 346-49.)

Hart returned to Aunt Martha's on November 23, 2011, stating she had severe

pain all over, all day, including in her lower back, hands, shoulders, and knees.  (R. 420-

21.)  Blood tests were ordered.  (R. 421.)  She returned a month later with similar

complaints, at which time a physical examination was essentially normal.  (R. 418.)  She

was counseled on the importance of diet and exercise. (R. 419.) The examining physician assessed hypertension, hyperlipidemia, osteoarthritis, and GERD, and recommended further evaluation with rheumatology, cardiology, and physical therapy. (*Id.*)

On January 11, 2012, Hart reported to the emergency department at Stroger Hospital complaining of difficulty breathing and joint pain. (R. 400.) She was referred to Stroger by her primary care physician because she lost her medical insurance and could no longer continue treatment. (*Id.*) She was described with a history of rheumatoid arthritis and hypertension. (*Id.*) Hart reported that she experienced shortness of breath after walking a half of block. (*Id.*) She suffered occasional chest pain that was non-exertional, sharp, and lasted for only a few seconds. (*Id.*) She reported that Naproxen was not working as well for her hand and neck pain as it used to. (R. 400.)

A physical examination was essentially normal. (R. 402-03.) Hart was in no acute distress and exhibited a full range of motion in her back. (*Id.*) An ECG was normal, as were chest x-rays. (R. 397, 403.) The examining physician opined that Hart suffered from dyspnea, rheumatoid arthritis, and osteoarthritis. (*Id.*) Her pain improved with medication, and she was discharged and referred to a primary care physician. (*Id.*)

On February 1, 2012, Hart saw Dr. Chukwudozie Ezeokoli at the referral of the Stroger for "rheumatoid arthritis," though Dr. Ezeokoli questioned whether she had ever been diagnosed with such. (R. 391.) She complained of severe body pain, insomnia and morning stiffness for the last two to three years, "severe enough to be disabling." (*Id.*) She also experienced shortness of breath on exertion, and was limited to walking 100 feet as a result. (*Id.*) At that time, she was taking Ranitidine, Lovastatin, Lisinopril,

and Vicodin.  (*Id.*)

Upon physical examination, Dr. Ezeokoli noted that Hart appeared to be in significant pain.  (R. 393.)  She exhibited pain in her hands on passive and active movement, pain in the right wrist and both shoulders, with limited range of motion, and tenderness in the lower back and knees.  (*Id.*)  Dr. Ezeokoli assessed polyarthritis, with possible rheumatoid arthritis, well controlled hypertension, hyperlipidemia, GERD, and shortness of breath.  (*Id.*)  He noted the possibility of depression, but decided to assess that further on her next visit when her pain would hopefully be better controlled.  (*Id.*)  He started Hart on a few different medications and ordered additional testing.  (*Id.*)  He referred her to the rheumatology department at Stroger.  (*Id.*)

On February 3, 2012, Dr. Ezeokoli completed a Arthritis Residual Functional Capacity ("RFC") Questionnaire, stating that he had been treating Hart since February 1, 2012.  (R. 378-81.)  He listed Hart's diagnoses as polyarthritis, hypertension, hyperlipidemia, and dyspnea, and assessed her prognosis as "chronic."  (R. 378.)  He identified Hart's symptoms as multiple joint pain, severe in nature, depression, fatigue, shortness of breath on minimal exertion, and morning stiffness.  (*Id.*)  Positive objective signs of her pain included joint warmth, reduced grip strength, impaired sleep, abnormal posture, tenderness, crepitus, trigger points, swelling, abnormal gait, and a positive straight leg raising test.  (*Id.*)  In Dr. Ezeokoli's view, emotional factors and depression contribute to her symptoms and pain, and her pain would frequently interfere with her ability to maintain attention and concentration.  (*Id.*)  Lightheadedness from her medication could also interfere with her ability to work.  (R. 380.)  Hart's impairments could be expected to last for more than twelve months.  (*Id.*)

6

As for functional limitations, Dr. Ezeokoli concluded that Hart could walk less than half of a city block, or 100 feet, without rest or severe pain. (R. 379.) She could sit for twenty minutes before needing to get up, and stand for ten minutes before needing to sit down. (R. 380.) In an eight-hour day, she could sit, stand and/or walk for less than two hours total. (*Id.*) She would need a job that would allow shifting positions, and would need three to four breaks during a regular work day. (*Id.*) He also explained that Hart required a cane and crutches when engaging in occasional standing and walking. (*Id.*) Hart could never lift fifty pounds; rarely twenty pounds; occasionally ten pounds; and frequently less than ten pounds. (R. 381.) She could never twist or climb ladders; could rarely stoop or crouch; but could occasionally climb stairs. (*Id.*) She has significant limitations in doing repetitive reaching, handling or fingering, and could only do so twenty percent of a work day. (*Id.*) Hart's symptoms are likely to produce good days and bad days, and she is likely to be absent from work more than four days per month. (*Id.*) In Dr. Ezeokoli's view, Hart was incapable of tolerating even low stress jobs. (R. 380.)

Dr. Ezeokoli also completed a Cardiac RFC Questionnaire, explaining that Hart suffers from shortness of breath, fatigue, and weakness. (R. 382.) According to Dr. Ezeokoli, Hart has "marked limitation of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity," even though she is comfortable at rest. (R. 382.) Hart's depression also affects her physical condition, and he concluded that her cardiac conditions would frequently interfere with her attention and concentration to perform simple work tasks. (*Id.*)

Hart saw Dr. Ezeokoli for a follow-up on April 6, 2012. (R. 427-31.) She reported

that the pain medication he previously prescribed did not work.  (R. 427.)  She had not yet made an appointment with the rheumatology department.  (*Id.*)  A physical examination revealed the same results as her previous visit.  (R. 429-30.)  A connective tissue disease work up was negative.  (R. 430.)  Dr. Ezeokoli switched Hart's medications and planned to refer her to physical therapy, a musculoskeletal clinic, and a pain clinic.  (*Id.*)  Depression was still listed with a question mark, though he prescribed Zoloft.  (*Id.*)

## 2.    State Agency Consultants

On August 20, 2010, Dr. R. Hawkins examined Hart and completed a Report of Incapacity for the Illinois Department of Public Aid.  (R. 289-92.)  Hart reported a history of cardiomegaly, hypertension, and arthritis.  (R. 289.)  She explained that she was supposed to be taking medications, but could not afford them.  (*Id.*)  The physical examination was essentially normal.  (R. 289-92.)  Dr. Hawkins found no range of motion deficits or neurological impairments.  (R. 290-91.)  He concluded that Hart could perform all functions of sustained physical activity, such as walking, sitting, and standing at full capacity; could perform physical activities of daily living at full capacity; and could lift up to twenty pounds repeatedly in a normal work week.  (R. 292.)  As for Hart's mental capacity, her appearance, behavior, and ability to relate were normal.  (*Id.*)  Her memory and judgment were intact.  (*Id.*)  Dr. Hawkins found no limitations in Hart's mental ability to perform activities of daily living, in social functioning, or in concentration, persistence, and pace.  (*Id.*)

On October 21, 2010, Hart underwent a consultative exam with Dr. Dinesh Jain for the Bureau of Disability Determination Services.  (R. 294-96.)  Hart explained that

she had an eleventh grade education and worked in a packaging job until January 2010. (R. 294.)  She stated that for the last two years she suffered from shortness of breath, which had gotten progressively worse.  (*Id.*)  She said that one of her doctors told her she had an enlarged heart, but Dr. Jain noted that there was no history of congestive heart failure.  (*Id.*)  Dr. Jain commented on the ECG from 2008 that revealed an ejection fraction of fifty percent and acknowledged that the stress test showed slight left atrial dilatation and mild to moderate concentric left ventricular hypertrophy.  (*Id.*)  Hart also told Dr. Jain that she had Bell's palsy on the left side in 2002 that had been resolved after she was given steroids.  (*Id.*)

Hart denied chest pain or shortness of breath, but stated she could walk only about 100 feet before becoming short of breath.  (R. 294.)  She could not climb any stairs.  (*Id.*)  She was not taking oxygen at the time.  (*Id.*)  Hart described pain in both hands and her left heel, and had been told she had a left heel spur.  (*Id.*)  She rated the pain in her heel a six on a ten-point scale, and the pain in her hands (which comes and goes) as a ten.  (*Id.*)  She also said that her fingers swell at times.  (*Id.*).

A physical examination was essentially normal.  (R. 294-96.)  Hart's speech was clear and easily understood.  (R. 295.)  There were no clinical signs of cardiomegaly. (*Id.*)  Her range of motion along all joints of the upper extremities was within normal limits.  (*Id.*)  Finger dexterity, grip strength, and fine finger manipulation were normal. (*Id.*)  Range of motion along the cervical and lumbar spine was within normal limits.  (R. 296.)  Hart exhibited a normal gait and walked without an assistive device.  (*Id.*)  Hart did show some difficulty in performance.  (*Id.*)  When asked to walk on her toes, Hart could not do so due to the pain caused by her left heel spur.  (*Id.*)  She could not walk

on her heels or hop on one leg for the same reason. (*Id.*) Dr. Jain assessed a history of dyspnea with unknown origin, pain in both hands of unknown origin (but with normal results on examination), and left heel spur with pain in the left heel. (R. 296.)

On November 3, 2010, Dr. Vidya Madala completed a Physical RFC Assessment. (R. 301-08.) According to Dr. Madala, Hart could occasionally lift fifty pounds, frequently twenty-five pounds; could stand and/or walk for six hours in an eight-hour day; could sit for six hours in an eight-hour day; and had an unlimited ability to push and pull. (R. 302.) Dr. Madala further recommended that Hart could only occasionally climb ladders, ropes, or scaffolds. (R. 303.) She found no other postural, manipulative, visual, communicative, or environmental limitations. (R. 303-05.)

In reaching her conclusions, Dr. Madala acknowledged Hart's complaints of shortness of breath, but noted a lack of history of congestive heart failure. (R. 308.) She cited to the findings from the 2008 testing, such as the fifty percent ejection fraction and the mild to moderate concentric left ventricular hypertrophy. (*Id.*) She noted the normal examination of Hart's hands, despite complaints of pain, and noted her left heel pain due to a heel spur. (*Id.*) According to Dr. Madala, Hart's statements regarding daily activities were not credible because there was no support in the medical record for her claimed limitations. (*Id.*) Dr. Bharati Jhaveri affirmed Dr. Madala's RFC assessment on April 22, 2011. (R. 374-76.)

## C. Claimant's Testimony

Hart appeared at the hearing before the ALJ and testified as follows. At the time of the hearing, Hart was 49 years old. (R. 42.) She stands five feet tall and weighs 161 pounds. (*Id.*) She said that she completed the ninth grade. (*Id.*) Hart has been

separated from her husband since 2004 and lives with her adult daughter.  (R. 41.)

For about four years in the early 2000s, Hart babysat for three children five days a week.  (R. 47, 53-54.)  Her babysitting income was not listed in her earnings statement because she did not realize she needed to report it.  (R. 54.)  From 2005 through 2008, Hart worked for a State of Illinois program that provided services for disabled individuals, such as cooking, cleaning, and transportation.  (R. 42-44.)  Most recently, for about six months in 2010, Hart worked as a candy packer.  (R. 44.)  Since 2010, Hart has not attempted to work.  (R. 45-46.)

Hart testified that she had a stroke and now suffers from Bell's Palsy, which causes her left eye and mouth to be "crooked."  (R. 47.)  As a result, she has difficulty speaking at times and her left eye "drips all the time."  (*Id.*)  Hart also suffered a slipped disc in her neck, which causes constant pain, especially when she was looking down trying to read something.  (R. 48.)  The pain radiates from the middle of her neck up to her temples.  (*Id.*)  Hart also experiences pain in her shoulder, the joints in her fingers, her knees, her hips, and her left ankle.  (R. 48-49.)  She described her pain as a "burning" sensation.  (R. 52.)

Hart used a walker at the hearing, which she testified she got through a pain clinic.  (R. 49.)  She does not use the walker all the time.  (*Id.*)  Hart testified that she has good days and bad days.  (*Id.*)  She usually has four bad days a week.  (R. 50-51.)  On those days, her legs are swollen, her fingers lock, and she cannot do anything but lay in bed, cry, and take pain medication.  (R. 49-50, 52.)  She uses hot packs and ice packs for the swelling.  (R. 50.)  On bad days, she can usually only stand a couple of minutes at a time if she has her walker.  (*Id.*)  She can sit for about thirty minutes before her left

hip starts bothering her. (*Id.*) Hart's daughter does most of the household chores such as cooking and cleaning. (R. 51.) On good days, Hart can walk for two to three blocks. (R. 50.) On those days, Hart also tries to get up and do little chores around the house. (R. 51-52.)

Hart testified that her pain often leaves her feeling depressed because she cannot do the things she loves to do, such as cooking and taking care of other people. (R. 51.) She also has difficulty sleeping and concentrating. (R. 52-53.) The pain interferes with her ability to read and communicate with others. (R. 53.) Hart testified that she did not believe she could work because she can barely get around the house. (*Id.*)

When asked by the ALJ why she was given a pulmonary function test, Hart responded that in 2006 or 2007 she passed out and was rushed to the emergency room, at which time she was given blood. (R. 56.) It was determined that her heart was not pumping enough blood. (*Id.*) She also got a stress test. (*Id.*) Hart explained that she continues to suffer from shortness of breath. (*Id.*)

### D. Vocational Expert's Testimony

Vocational expert ("VE") Pamela Tucker also testified at the hearing. The ALJ first asked the VE to consider a hypothetical younger individual, who has a limited education, and no past relevant work. (R. 58.) The individual is limited to light exertion and occasional climbing of ladders, ropes, and scaffolds, but can frequently climb ramps or stairs, stoop, crouch, kneel, crawl, can frequently reach, including overhead, can frequently handle objects with the right dominant hand and upper extremity, and can use the hands for fine manipulation on a frequent basis. (*Id.*) The VE testified that such an

individual could perform work in the regional or national economy, including as a housekeeper (15,000 jobs in Illinois), laundry aide (9,000 jobs), and as a cleaner/polisher (2,800 jobs). (R. 59.) Those jobs are all light and unskilled. (*Id.*) The VE further testified that the postural and minimal limitations the ALJ described in this hypothetical would not erode the unskilled occupational base at the light exertion level. (R. 59-60.)

Next, the ALJ asked the VE to consider the same hypothetical individual, but who is further unable to engage in sustained work activity on a regular and continuing basis for eights hours a day, five days a week. (R. 59.) The VE testified that such an individual would be unable to perform any jobs in the national economy. (*Id.*) The VE confirmed that her testimony was consistent with the Dictionary of Occupational Titles. (R. 60.)

Upon questioning by claimant's counsel, the VE testified that individuals are usually not permitted to miss more than one day of work per month. (R. 60.) She explained that some employers may tolerate two half-day absences per month, but more than two half day absences per month would not be tolerated. (R. 60-61.) The VE further testified that individuals usually get two fifteen minute breaks, one in the morning and one in the afternoon, and one thirty minute lunch break. (R. 61.) Generally, an individual can be off task for no more than fifteen percent of each workday. (*Id.*) She explained that an individual would not be able to maintain employment if she was ninety-five percent on task on three days a week, but only sixty percent on task on the other two days. (*Id.*)

## II.    ANALYSIS

13

## A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is greater than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir.1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate her assessment of the evidence to assure us that the ALJ considered the important evidence...[and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.1985)).

## B. Analysis under the Social Security Act

In order to be entitled to SSI, a claimant must be disabled under the Social Security Act. A person is disabled under the Act if he or she is "unable to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski*, 245 F.3d at 885-86. If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

ALJ Hellman applied this five step analysis. At step one, he determined that Hart had not engaged in substantial gainful activity since July 15, 2010. (R. 21.) At step two, the ALJ determined that Hart suffers from the following severe impairments: hypertension and arthritis. (R. 21-24.) He also determined that she suffered from non-severe impairments of obesity, a cardiac impairment, a pulmonary impairment, and high cholesterol. (R. 21-24.) Next, at step three, the ALJ concluded that Hart does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 24.)

The ALJ went on to assess Hart's RFC, concluding that Hart maintained the ability to perform light work as defined in 20 C.F.R. 416.967(b), with the exception of occasional climbing of ropes, ladders or scaffolds; frequent climbing of ramps and/or stairs; frequent stooping, kneeling, crawling, and crouching; frequent overhead reaching; frequent handling of objects with the right hand; and frequent use of hands for fine manipulation. (R. 24-28.) Based on this RFC, and Hart's age, education, and work experience, the ALJ determined that there exist jobs in the national economy that Hart could perform, such as housekeeper, laundry aid, and cleaner/polisher. (R. 29-30.) As a result, a finding of not disabled was entered. (R. 30.)

Hart now argues that the ALJ failed to (1) properly weigh the opinion of her treating physician Dr. Ezeokoli; (2) properly assess her RFC; (3) properly consider the effect of her mental impairments; and (4) properly assess her credibility.

### C. The ALJ Properly Considered Claimant's Complaints of Mental Impairments.

Claimant argues that the ALJ committed reversible error when he failed to apply the "special technique" to assess her mental impairments or order that she undergo a psychological examination. The Commissioner responds that any failure by the ALJ to explicitly reference the special technique was harmless error, and that the claimant did not meet her burden in showing additional psychological testing was required. We agree.

The special technique is set forth in 20 C.F.R. § 416.920a and is used to evaluate the severity of mental impairments. The special technique sets forth a two-part analysis that first requires the ALJ to evaluate a claimant's "pertinent symptoms, signs, and

16

laboratory findings to determine whether [a claimant has] a medically determinable mental impairment(s)." 20 C.F.R § 416.920a(b)(1). Such an impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 416.908; *see also* 20 C.F.R. § 416.928. If the ALJ determines that the claimant has a medically determinable mental impairment, "the ALJ must document that finding and rate the degree of function limitation in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Pepper v. Colvin*, 712 F.3d 351, 365 (7th Cir. 2013); 20 C.F.R § 416.920a(b),(c). "Under some circumstances, the failure to explicitly use the special technique may ... be harmless error." *Craft v. Astrue*, 539 F.3d 668, 675 (7th Cir. 2008).

Here, at step two, the ALJ determined that Hart suffered from the severe impairments of hypertension and arthritis, and non-severe impairments of obesity, a cardiac impairment, a pulmonary impairment, and high cholesterol. He went on to address Hart's complaints of heel spurs, GERD, radiculopathy, and depression. With respect to those issues, the ALJ stated "[a]side from the claimant's subjective complaints, there is no medical evidence consisting of signs, symptoms, and laboratory findings that establish the severity of any of the aforementioned impairments (*see* 416.908)." (R. 22.) He further stated that although Hart testified that she gets depressed, "there are no objective medical findings in the medical record to support the claimant's subjective complaints of depression." (R. 23.)

Thus, though he did not state as much, it appears that the ALJ was applying the first step of the special technique, that is, determining whether Hart's depression even

17

amounted to a medically determinable mental impairment.  In doing so, he looked to the record for signs, symptoms, and laboratory findings as required under the regulations. Notably, the record is almost entirely devoid of medical records referencing any mental impairments or resulting limitations, and there are no records from mental health professionals.

Hart is correct that the ALJ failed to acknowledge two notes by Dr. Ezeokoli, an internist, raising the possibility of depression and his decision to prescribe Zoloft. However, this does not render the ALJ's analysis on this issue reversible.  Having determined that Hart's depression did not amount to a medically determinable mental impairment, the ALJ was not required to move on to the next step of the special technique and rate Hart's degree of function in the categories set forth above. Nonetheless, the ALJ proceeded to discuss Hart's abilities in those categories, citing to her reports of daily activities, her ability to interact with others, some of the notes from the Field Office examiners regarding her ability to concentrate and understand, and the absence of any episodes of decompensation.  (R. 23-24.)  All of this leaves us confident that the ALJ properly considered Hart's complaints of mental impairments.  On this record, any failure to explicitly reference the special technique or provide a more thorough analysis amounts to harmless error.

Lastly, we reject Hart's assertion that the ALJ should have ordered her to undergo a psychological examination.  As the Commissioner argues, "[p]articularly in counseled cases, the burden is on the claimant to introduce some objective evidence that further development of the record is required."  *Poyck v. Astrue*, 414 Fed. Appx. 859, 861 (7th Cir. 2011) (citing *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007);

*Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997). Hart, who was represented by counsel at the administrative level, never requested a consultative examination or argued that the record required further development. As a result, we defer to the ALJ's decision not to order additional examinations. *Nelms v. Astrue*, 533 F.3d 1093, 1098 (7th Cir. 2009) ("This court generally upholds the reasoned judgment of the Commissioner on how much evidence to gather").

> **D.    The ALJ's RFC Determination and Credibility Determination are Not Supported by Substantial Evidence.**

Hart also argues that the ALJ's RFC determination is not supported by substantial evidence and that his reasons for discounting her credibility are flawed. The Commissioner responds that the RFC determination is supported by the evidence and that the ALJ's credibility determination is not patently wrong. On these points, we agree with Hart.

The RFC is the most a claimant can still do despite her limitations. 20 C.F.R. § 416.945(a)(1). In making the RFC determination, the ALJ will consider all of the relevant medical and other evidence in the record, including evidence of impairments that are not severe. 20 C.F.R. § 416.945(a)(3); *Craft*, 539 F.3d at 676. The RFC assessment must contain a narrative discussion describing how the evidence supports the ALJ's conclusions and explaining why any medical source opinion was not adopted if the ALJ's RFC assessment conflicts with such an opinion. SSR 96-8p, 1996 WL 374184, at **5, 7; *accord Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). A court will uphold an ALJ's decision "if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review."

*Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012) (*citing Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008)).  "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence."  *Arnett*, 676 F.3d at 592.

Here, the ALJ concluded that Hart maintained the RFC to perform light work, except that she could occasionally climb ropes, ladders or scaffolds; could frequently climb ramps and/or stairs; frequently stoop, kneel, crawl, and crouch; frequently reach overhead; frequently handle objects with the right hand; and frequently use her hands for fine manipulation.  In fashioning this RFC, the ALJ reviewed various medical records, the opinions of the consulting physician and examiners, and of her treating physician. He also reviewed claimant's own complaints of symptoms and limitations, ultimately finding those complaints inconsistent with the record.

Concerning to the Claimant and the Court is the ALJ's disregard for certain evidence in the record that does in fact corroborate claimant's complaints and could play a role in her RFC.  First, although the ALJ acknowledged Hart's pulmonary and cardiac impairments and poor pulmonary testing results, he does not appear to have adequately considered any resulting limitations when determining her RFC.  Instead, the ALJ simply stated that the pulmonary testing took place when Hart was a smoker.  But it does not necessarily follow that Hart's poor pulmonary function was solely the result of smoking. The ALJ also cited to cardiac testing that supported his conclusion, but improperly left out the result that showed Hart's ejection fraction was at the very low level of normal. *See Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014) (explaining that the Court has "repeatedly forbidden" ALJs from cherry-picking only the medical evidence that supports

20

their conclusion). Further, the record is full of complaints of shortness of breath and a Field Office representative even noted that Hart was short of breath during a telephone interview, clearly a non-exertional activity. On this record, we are left wondering if the ALJ properly considered any and all limitations caused by Hart's impairments, even those that are not severe.

Even more concerning is the ALJ's credibility assessment. Of course, the ALJ is in the best position to determine the credibility of witnesses, and this Court reviews that determination deferentially. *Craft*, 539 F.3d at 676 (*citing Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)). The ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2. It is well settled that an ALJ "may not reject a claimant's subjective complaints of pain solely because they are not supported by medical evidence." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

Though the ALJ went beyond providing only disfavored boilerplate language, *see Bjornson v. Astrue,* 671 F.3d 640, 644-45 (7th Cir. 2012), the additional reasons he provided for discrediting Hart's complaints are unsupported by the record or are otherwise flawed.

First, the ALJ took great issue with what he viewed as routine and conservative treatment, noting that Hart never sought treatment from a specialist. Although an ALJ must consider the nature of a claimant's treatment, an ALJ should not draw inferences about a claimant's condition from an infrequency of treatment unless he first explores

the claimant's reasons for that infrequency. *Craft,* 539 F.3d at 679. Here, the ALJ ignored countless references in the record and at the hearing regarding Hart's inability to afford treatment. At times, Hart was unable to pay for her medications and she had to switch physicians when she lost her insurance coverage. The ALJ should have at least made clear that he considered Hart's dire financial situation before discounting her complaints due to infrequent treatment.

The ALJ also believed that Hart was exaggerating her symptoms because she used a walker and wore sunglasses at the hearing without any documented need for either. A walker (or sunglasses for that matter) need not be prescribed by a physician, meaning the use of a walker absent a prescription "is not probative of the need for the cane in the first place." *Eakin v. Astrue*, 432 Fed. Appx. 607, 613 (7th Cir. 2011) (*citing Terry v. Astrue*, 580 F.3d 471, 477-78 (7th Cir. 2009)). What is more, Hart testified that she got the walker from her pain clinic. The record reveals that Dr. Ezeokoli referred Hart to a pain clinic on April 6, 2012. That Hart could have visited the pain clinic between April 6, 2012 and May 30, 2012 (the date of the hearing) and obtained the walker is certainly not a difficult proposition to accept.

Further, the ALJ took issue with the fact that claimant had applied for and received unemployment benefits during the period she claimed disability, thereby certifying that she was ready, willing, and able to work. Though the ALJ is allowed to consider such a fact, the Seventh Circuit has made clear that "attributing a lack of credibility to such action is a step that must be taken with significant care and circumspection" and all surrounding facts must be carefully considered. *Scrogham v. Colvin*, 765 F.3d 685, 699 (7th Cir. 2014). We question whether such a careful

consideration took place here. The ALJ also doubted Hart's truthfulness because she failed to report earnings from her babysitting job to the IRS. It is not surprising, however, that an individual with a limited education would be unaware of tax reporting requirements.

All of this leaves us without a logical bridge supporting the entirety of the ALJ's RFC determination and we remand this matter for further proceedings. On remand, the ALJ should take care to provide a narrative explaining what evidence supports his RFC determination.

In light of our decision to remand, we comment only briefly on the ALJ's treatment of Dr. Ezeokoli's opinion. In rejecting that very restrictive opinion, the ALJ stated that it appeared to be based heavily on Hart's subjective complaints and limitations. He went on to reiterate that "there exist good reasons for questioning the reliability of the claimant's subjective complaints." (R. 28.) But, because we have determined that those "good reasons" were flawed, the ALJ's ability to properly weigh the opinion of Dr. Ezeokoli may have been hindered. *Engstand v. Colvin*, 788 F.3d 655, 662 (7th Cir. 2015). On remand, if the ALJ still decides not to afford Dr. Ezeokoli's opinion controlling weight, he shall "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine what amount of weight to afford the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 416.927(c)(2).

III.    CONCLUSION

For the reasons set forth above, claimant's motion for summary judgment is

granted in part and the Commissioner's request for summary judgment is denied.  This

case is remanded to the Social Security Administration for further proceedings

consistent with this order.  It is so ordered.


**ENTERED:**

**Michael T. Mason**
**United States Magistrate Judge**


**Dated: September 9, 2015**